UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

PATRICIA DALTON OHLE, individually and
on behalf of her children;
MUSEUM OF SPORTS HISTORY, LLC;
DALTON-OHLE INVESTMENT PROPERTY TRUST;
JSJD TRUST; and FESTIVUS FOR THE
REST OF US, INC.                                                                      **PLAINTIFFS**

V.                                                          1:15 cv 02965       ( uA )

ECETRA N. AMES, HUGH A. UHALT,
JOHN D. WOGAN, ANTHONY M. AMES, AND
ANTHONY M. & ECETRA N. AMES 1999
CHARITABLE REMAINDER UNITRUST                                  **DEFENDANTS**

_____

COMPLAINT

_____

JURY TRIAL DEMANDED

The complaint of plaintiffs Patricia Dalton Ohle, a person of the full age of

majority and residing in Cook County, Illinois, appearing individually and on behalf

of her children John B. Ohle, IV, John Keane Dalton Ohle, and John Patrick Ohle;

Museum of Sports History, LLC, a Delaware limited liability company with its

principal offices in Cook County, Illinois; Dalton-Ohle Investment Property Trust, a

trust created under the laws of the State of Louisiana appearing herein through its

trustee John K. Dalton, Jr., a person of the full age of majority and residing in St.

Tammany Parish, Louisiana; JSJD Trust, a trust created under the laws of the State of

Illinois appearing herein through its trustee John K. Dalton, Jr., a person of the full

age of majority and residing in St. Tammany Parish, Louisiana; and Festivus for the

Rest of Us, Inc., a Delaware corporation with its principal offices in St. Tammany Parish, Louisiana, respectfully represents as follows:

1.     Made defendant herein is Ecetra N. Ames ("Cetie Ames"), a person of the full age of majority and resident of New York City, New York.

2.     Also made defendant herein is Hugh A. Uhalt ("Uhalt"), a person of the full age of majority and resident of the City of New Orleans, Orleans Parish, Louisiana.  Uhalt is the son of Cetie Ames.

3.     Also made defendant herein is John D. Wogan ("Wogan"), a person of full age of majority and resident of New Orleans, Orleans Parish, State of Louisiana. Wogan served as successor trustee of the Ames CRUT, as defined below, following John B. Ohle, III's ("Ohle") resignation as trustee.

4.     Also made defendant herein is Anthony M. Ames ("Tony Ames"), a person of the full age of majority and resident of Atlanta, Georgia.  Tony Ames is the husband of Cetie Ames and the stepfather of Uhalt.

5.     Also made defendant herein is the Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Unitrust ("Ames CRUT"), a trust created and administered under the laws of the State of Louisiana appearing herein through its current trustee Steven O. Medo, Jr., with offices at 1010 Common St., Suite 2450, New Orleans, Louisiana 70112.

6.     This court has federal question jurisdiction over this matter pursuant to 28 U.S.C. 1331.   In addition, this court retains jurisdiction to interpret the stipulations and orders governing the disposition of plaintiffs' assets herein, and the court has ancillary jurisdiction over plaintiffs' state law claims.  All of the defendants

either reside or have committed wrongs or transacted business in this judicial district, including without limitation making false statements and providing perjured testimony to U.S. government agencies and before the United States District Court for the Southern District of New York in the matter of U.S. v. John B. Ohle, III et al., No. S3-08-CR-1109(JSR) to wrongfully obtain forfeiture/restitution orders as well as other fraudulent acts out of which the claims presented herein arise. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in this district and because the defendants are subject to personal jurisdiction in this district.

### Preliminary Statement/Nature of this Action

7.    This is an action to recover actual, consequential and punitive damages based on defendants' fraud scheme to unlawfully remove millions of dollars from the Ames CRUT, unlawfully remove Ohle as trustee of the Ames CRUT, and unlawfully recover monies through unlawful forfeiture/restitution orders and civil judgments. The object of the defendants' fraud scheme was in part to unlawfully gain control of Cetie Ames' fortune at the expense of Ohle, the plaintiffs, and numerous charitable beneficiaries through false and perjured testimony and sworn declarations to the courts, the Department of Justice, and the IRS. The defendants' fraud scheme was uncovered by Ohle in proceedings in the Civil District Court for the Parish of Orleans, State of Louisiana, and the Southern District of New York which included evidence from documents produced in discovery by Cetie Ames to Ohle in February 2014, in depositions of Wogan, Uhalt and Tony Ames

taken on March 25, 2014, May 29, 2014 and June 3, 2014 respectively, in documents produced by the government to Ohle on August 27, 2014, September 29, 2014 and October 1, 2014, and in documents produced by Kyle Theard, CPA to Ohle on September 16 and 18, 2014, and their fraud scheme continues to this day.

8.     The fraud scheme is being perpetrated by the defendants to fraudulently obtain monies from J.P. Morgan Chase & Co. ("Chase") and Ohle related to Chase's illegal tax shelter activities and to fraudulently recover market losses and/or associated fees that were the result of freely and voluntarily made investment decisions by defendants based on the advice of Uhalt and trusted investment advisors, and not based on investment advice from Ohle.  The actions of the defendants sought to wrongfully accuse and blame Ohle in order to obtain monies from Chase and Ohle related to Chase's illegal tax shelter activities.  The defendants also sought to wrongfully accuse and blame Ohle for market losses and the misrepresentations by the issuer and/or investment advisor for her investments in the warrants at issue herein.  As more fully set forth herein, the defendants sought to fraudulently induce Ohle to resign as trustee of the Ames CRUT and insert Wogan as successor trustee to achieve one of Uhalt's objectives of impoverishing Tony Ames, his stepfather; to turn over all of the assets of the Ames CRUT to Wogan as successor trustee to advance the unlawful scheme described herein; to sign a settlement agreement which contained false assertions which were later used to facilitate the scheme described herein; and to forego, bargain away, compromise, and/or transfer certain property rights and benefits which Ohle and the plaintiffs would not have done but for the fraudulent promises and representations of the

defendants, all of which were designed to fraudulently obtain monies through forfeiture/restitution orders from plaintiffs and others.

9.     As part of the fraud scheme, defendants have deliberately and intentionally misrepresented Ohle's role and responsibilities with regard to the investments described herein, his legal authority to authorize payment of sales commissions on Cetie Ames' personal investments in the warrants, his receipt of sales commissions and his role in authorizing and directing the payments of those sales commissions, all of which resulted in defendants fraudulently obtaining monies through forfeiture and restitution orders from plaintiffs and others.  Further, in order to become successor trustee (and to re-insert himself into Cetie Ames' financial affairs) and to facilitate the unlawful removal of millions of dollars from the Ames CRUT, Wogan wrongfully inserted certain allegations into the settlement agreement which Ohle denied and which led to the addition of strict confidentiality provisions.  As more fully described herein, Wogan and others intentionally breached the confidentiality provisions in the Southern District of New York and before the Louisiana CPA Board, and used these false allegations in connection with the Request for a Private Letter Ruling and the Petition for Instructions, and these same fraudulent assertions were ultimately made by defendants to obtain unlawful forfeiture/restitution orders in the Southern District of New York.

10.     At all material times, defendants and others acting on their behalf had actual knowledge:  (1) that a five percent (5.0%) sales commission was charged by the issuer and/or investment advisor on the warrants in 2002; (2) that Cetie Ames contractually agreed to pay those sales commissions; and (3) that those sales

commissions were paid by the investment advisor to its hedge fund salesman. Defendants and others acting on their behalf refused to disclose these facts because such facts would have contradicted and exposed their false position in civil proceedings and in related IRS and criminal proceedings (which resulted in defendants fraudulently obtaining monies through forfeiture and restitution orders from plaintiffs and others). Wogan's and Uhalt's orchestration of these misrepresentations advanced several objectives: (1) to insert Wogan (who had previously represented Cetie Ames' mother's estate and who wanted a greater role in Cetie Ames' financial affairs) into Cetie Ames' financial affairs, (2) to implement Uhalt's scheme to deprive his stepfather of income and assets, and (3) to assist Uhalt to gain control of his mother's fortune.

11. Defendants also misrepresented that fully-disclosed loan transactions were an unlawful attempt by Ohle to misappropriate funds. Defendants refused to disclose the true facts concerning the loan transactions because such facts would have contradicted and exposed their false position in civil proceedings and related criminal proceedings and undermined their scheme to fraudulently obtain monies from plaintiffs, Ohle and numerous charitable beneficiaries through forfeiture/restitution orders and judgments. These representations include, without limitation, Wogan's false statements to the Southern District of New York regarding Ohle's actions as trustee and in connection with the final accounting and turnover of assets.

12. The misrepresentations advanced by the defendants were also used in connection with a Request to the IRS for a Private Letter Ruling and Petition for

Instructions from the Civil District Court for the Parish of Orleans, despite the fact that defendants were specifically aware that the representations they made in connection with these filings were false and fraudulent, all of which allowed Cetie Ames and Uhalt to gain complete control over millions of dollars to the detriment of plaintiffs, Ohle and numerous charitable organizations.

13.    Notwithstanding the defendants' actual knowledge of the falsity of their claims, as shown by evidence and documents produced in filings and discovery in 2014, they have viciously, vexatiously, maliciously and fraudulently pursued various legal proceedings and actions against Ohle resulting in damages to plaintiffs including without limitation unlawful forfeiture and restitution orders and extensive consequential monetary damages stemming from the restraint, forfeiture and/or loss of plaintiffs' assets, other related business and financial losses, and severe personal losses (including reputational damages, embarrassment, humiliation, loss of affection, and severe mental and emotional pain and suffering and distress).

### Factual Background

14.    Cetie Ames, a wealthy heiress to a Procter & Gamble ("P&G") fortune, is married to Tony Ames. Cetie Ames has five children. Uhalt is a son from Cetie Ames' first marriage. Cetie Ames' four other children are from her marriage to Tony Ames.

15.    In the 1990s, Ohle, a certified public accountant, was employed at KPMG LLP where he handled Cetie Ames' mother Leah A. Nippert's estate. Ohle, who knew Cetie Ames' son Uhalt socially, met Cetie Ames during this estate

administration engagement. Ohle remained friends of the Ames family when he transferred to KPMG's Washington National Tax office in 1998.

16.    In December 1999 (following Ohle's resignation from KPMG and prior to his employment at Bank One), Cetie Ames established, as Settlor, the Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Trust ("Ames CRUT") with the transfer of approximately $5 million of P&G stock, naming herself and her husband, Tony Ames, as income beneficiaries, and Ohle as trustee. Ohle, as trustee, accepted the duties and responsibilities set forth in the trust instrument establishing the Ames CRUT on December 17, 1999.

17.    Charitable remainder unitrusts are an Internal Revenue Code-based planning device used to diversify one's holdings (without current taxation), to provide quarterly payments to income beneficiaries, and to achieve charitable planning goals.

18.    During the technology market correction of 2000, the Ames CRUT technology portfolio suffered losses significantly lower than the NASDAQ benchmark. However, Cetie Ames, who had experienced well above average annual appreciation in P&G of approximately 20%, had irrational expectations of outsized returns with little risk.

19.    This market correction caused Cetie Ames to panic, resulting in her demands to liquidate the Ames CRUT's technology portfolio.

20.    Cetie Ames' unrealistic expectations, personal issues and dysfunctional family dynamics led to many challenges regarding the re-investment of the cash in the Ames CRUT.

21.   Cetie Ames' erratic behavior also posed continuing problems regarding the quarterly distributions from the Ames CRUT to Cetie and Tony Ames.

22.   While the Ames CRUT provided that the Trustee shall pay to Cetie Ames and Tony Ames in equal amounts during their lifetimes, Cetie Ames would routinely demand that the Ames CRUT distributions be altered (paying all, some or none to Tony Ames) or, even, withheld based on her current circumstances and mood.

23.   Ohle was able to invest some Ames CRUT funds at above market rates while investment discussions were ongoing with the Ames CRUT beneficiaries.

24.   Following many meetings and discussions, on November 16, 2000, Cetie Ames transferred an additional $2.8 million of P&G stock to the Ames CRUT to meet her and Tony Ames' cash flow needs.

### SocGen Warrants

25.   In June 2001, Douglas E. Steger, a hedge fund salesman for Carpe Diem Capital, LLC ("Carpe Diem"), introduced Bank One to Ed Doherty, who was a principal of Carpe Diem.  Carpe Diem, as an agent of SG Cowen, both promoted Alternative Investment Fund Linked Warrants ("SocGen Warrants") and served as investment advisor in the SocGen Warrants.

26.   The Draft Summary of Confidential Private Offering (the "Prospectus") for the SocGen Warrants made the followings claims:

(a)   SocGen Warrants investment objective was to yield absolute performance in either bull or bear markets;

(b)     SocGen Warrants' trading assets were managed by a pool of recognized alternative investment specialists;

(c)     SocGen Warrants' risk management, documentation and reporting was performed by Lyxor Asset Management with audits performed by PriceWaterhouseCoopers;

(d)     SocGen Warrants' leverage policy increased upside potential in good times, and protected against losses in bad times;

(e)     SocGen Warrants sought capital appreciation over the medium term, by allocating the optimal level of assets to the Carpe Diem Multi-Strategy Fund; and,

(f)     The Carpe Diem Dynamic Fund had a 16.84% compounded historical annual return.

27.     Despite these claims in the Prospectus, the SocGen Warrants experienced consistent monthly losses.

28.     In order to preserve the corpus of the Ames CRUT, Ohle liquidated the Ames CRUT's SocGen Warrants on July 9, 2002 following an approximate 20% decline in the SocGen Warrant's fair market value.  Cetie Ames also chose to liquidate her position in the SocGen Warrants on August 5, 2002.  After numerous discussions, Cetie Ames directed Societe Generale to transfer the proceeds from the liquidation of her SocGen Warrants into the Ames CRUT.

### The Scheme To Gain Control

29.     Uhalt repeatedly attempted to assert himself in his mother's affairs. Cetie Ames had previously refused to allow her son Uhalt to manage her investable assets and limited his access to her financial information.   Uhalt made false

10

misrepresentations to convince Cetie Ames that they should remove Ohle as trustee of the Ames CRUT and unlawfully gain control over millions of dollars from the Ames CRUT and other assets to the detriment of plaintiffs, Ohle and numerous charitable organizations. In order to gain control of the assets in the Ames CRUT, Uhalt orchestrated the hiring of Wogan. In order to become successor trustee, to re-insert himself into Cetie Ames' financial affairs, and to facilitate the unlawful scheme to remove millions of dollars from the Ames CRUT, Wogan made false representations to Ohle and investigated a series of baseless allegations. Uhalt also orchestrated the false and fraudulent representations made under oath by Tony Ames, Cetie Ames and Wogan as trustee of the Ames CRUT to the Civil District Court for the Parish of Orleans, State of Louisiana, in the Petition for Instructions and to the IRS in the Request for a Private Letter Ruling dated March 23, 2004 (both of which were produced to Ohle in discovery in September 2014) in order to remove assets from the Ames CRUT and to gain control over his mother's fortune.

30.    During this same period, Chase, as a result of Ohle's employment, played an increasing role in trust and investment services for Cetie Ames' children and/or their trusts, while Whitney National Bank continued to manage Cetie Ames' individual stock portfolio. Chase also served as tax return preparer for the Ames family and its trusts. Uhalt and Wogan, on the other hand, wanted to insert themselves into Cetie Ames' financial affairs.

31.    Given the poor performance of the SocGen Warrants, Uhalt aided and abetted by Wogan hatched a scheme to gain control of his mother's fortune. Uhalt's and Wogan's objectives were threefold: (1) to remove Ohle as trustee of the Ames

CRUT (thereby reducing Chase's ability to gain new Ames business); (2) to financially estrange his stepfather Tony Ames from Cetie Ames; and (3) to insert Wogan as successor trustee of the Ames CRUT (and thereby re-insert Wogan into Cetie Ames' financial affairs).

32.    In December 2002, Uhalt contacted Ohle and made a series of representations of material facts to Ohle.  Uhalt claimed he was acting pursuant to a power of attorney ("POA") from Cetie Ames, and demanded confidential financial information on his mother's financial affairs and the Ames CRUT.  Uhalt also claimed that he had proof that Ohle was colluding with Tony Ames to deprive his mother of her assets which led to the fraudulent and manufactured claim that Cetie Ames was not aware that she transferred the proceeds from the sale of her SocGen Warrants to the Ames CRUT.   Uhalt also represented that Ohle drafted the Ames CRUT instrument, used undue influence in the establishment of the Ames CRUT, and forged documents transferring millions of dollars of P&G stock into the Ames CRUT. Uhalt further claimed that Ohle provided investment advice to the Ames CRUT and Cetie Ames personally and made claims that Ohle was responsible for market losses in the Ames CRUT and the SocGen Warrants.  Moreover, Uhalt claimed that Ohle invested assets in the Ames CRUT without proper authority.  Uhalt also asserted that Ohle unlawfully authorized the payment of sales commissions on the purchase of SocGen Warrants, that Ohle wrongfully received these sales commissions, and that Ohle authorized and directed the payment of those sales commissions.  Uhalt also claimed that Ohle had duties and responsibilities beyond those set forth in the Ames CRUT, including tax return preparation, financial planning and diversification

of Cetie Ames' personal P&G holdings. Uhalt's claims also included accusations that his stepfather Tony Ames used undue influence in an effort to wrongfully deprive Cetie Ames of her assets. These claims and representations were made by Uhalt in order to unlawfully gain control of his mother's fortune. Wogan aided and abetted Uhalt in making these false representations to Ohle in order to become successor trustee (and to re-insert himself into Cetie Ames' financial affairs) and to facilitate the unlawful removal of millions of dollars from the Ames CRUT.

33.    Cetie Ames also made a series of representations of material facts to Ohle. Cetie Ames claimed that she did not intend to transfer $4.1 million to the Ames CRUT. She claimed that the funds in the Ames CRUT were transferred by mistake, that she did not understand the financial consequences of the transfer, and that she did not understand what she had signed. Cetie Ames also claimed that Ohle provided investment advice regarding the SocGen Warrants, that Ohle was required to use the previous investment advisor in considering the purchase of the SocGen Warrants, that Ohle authorized and/or directed payment of sales commissions on the SocGen Warrants, that she did not authorize the sales commissions, that she was unaware of the purchase of the SocGen Warrants by the Ames CRUT, that Ohle had a duty to provide her with statements for the Ames CRUT, and that Ohle had duties and responsibilities to Cetie Ames other than as trustee of the Ames CRUT. These claims and representations were made by Cetie Ames to fraudulently recover market losses and/or associated fees that were the result of freely and voluntarily made investment decisions by Cetie Ames based on the advice of trusted investment advisors, and not based on investment advice from Ohle. Wogan aided and abetted

13

Cetie Ames in making these false representations to Ohle in order to become successor trustee (and to re-insert himself into Cetie Ames' financial affairs) and to facilitate the unlawful removal of millions of dollars from the Ames CRUT.

34.    Ohle relied on the specific representations and claims of Cetie Ames and Uhalt, including without limitation Cetie Ames' claim that she did not intend to transfer $4.1 million to the Ames CRUT and Uhalt's claim that he possessed a POA from Cetie Ames.  Ohle hired an attorney to provide an accounting of the Ames CRUT, to resign as trustee, and to turnover all assets of the Ames CRUT to Wogan as successor trustee.

35.    Not only did the defendants make false representations on which Ohle and the plaintiffs relied, the defendants made false promises to Ohle in order to induce him to forego, bargain away, compromise, and/or transfer certain property rights and benefits and to enter into agreements which contained false assertions which were later used to facilitate the scheme described herein.  The false assertions were then used in connection with the Request for Private Letter Ruling and the Petition for Instructions.  These same fraudulent assertions were ultimately made by the defendants to obtain unlawful forfeiture/restitution orders in the Southern District of New York.  The plaintiffs relied upon these statements made by the defendants under oath.  Had the plaintiffs known that the sworn statements of the defendants were false and fraudulent, plaintiffs would not have entered into agreements and stipulations which deprived them of valuable property rights and which caused other actual and consequential damages to plaintiffs.

**14**