**The Scheme Continues with Misrepresentations to IRS**

36.      The defendants and others acting on their behalf continued their pattern of misrepresentations with false claims and allegations to United States governmental agencies, including the IRS and Department of Justice, and others. These misrepresentations and false claims were made to wrongfully remove property from the Ames CRUT and to wrongfully obtain monies from the plaintiffs, Ohle and numerous charitable beneficiaries.  Filings in Civil District Court and the Southern District of New York in 2014 (including without limitation (i) the Petition for Instructions with sworn verifications from Tony Ames, Cetie Ames and the Ames CRUT trustee John Wogan filed in the Civil District Court and (ii) the Request to IRS for a Private Letter Ruling dated March 23, 2004) reveal that based on advice from Uhalt and others, Cetie Ames, Tony Ames and the Ames CRUT through Wogan as trustee sought to unlawfully remove $4.1 million from the Ames CRUT.

37.      As part of defendants' scheme to unlawfully remove $4.1 million from the Ames CRUT, Cetie Ames and the Ames CRUT (through John Wogan), under penalty of perjury, made the following specific false statements and fraudulent representations in the Request to the IRS for Private Letter Ruling dated March 23, 2004 (and which were later contradicted by Tony Ames in his deposition on June 3, 2014):

(a)      On November 16, 2000, 38,000 shares of Procter & Gamble stock were transferred to the Ames CRUT under written signature that Ohle prepared for Cetie Ames' signature and submitted to Cetie Ames' bank, where the shares were held.

(b)    Ohle gave instructions for $250,000 to be transferred to Douglas E. Steger and to invest the balance of $4,750,000 in SocGen Warrants.

(c)    Ohle gave instructions for $100,000 to be transferred to Douglas E. Steger and to invest the remaining $1,900,000.

(d)    Cetie Ames was not aware that this fee was paid, nor that the investment was made on behalf of the Ames CRUT.

(e)    Cetie Ames discovered that Ohle had authorized the payment of the $250,000 fee to Douglas E. Steger.

(f)    Cetie Ames did not understand when she signed the Redemption Notice that it directed that funds be wired to an account owned by the Ames CRUT rather than to an account owned by Cetie Ames, nor did Cetie Ames understand that through the Redemption Notice she was making a donation to the Ames CRUT. Cetie Ames understood that the $4,100,549.27 was to be transferred to a money market account pending further investment of the funds.

38.    The Ames CRUT (through Wogan) and Cetie Ames, based on advice from Uhalt, trustee Wogan and others, falsely represented to the IRS that Ohle provided investment advice regarding the SocGen Warrants, that Ohle was required to use the previous investment advisor in considering the purchase of the SocGen Warrants, that Ohle authorized and/or directed payment of sales commissions, that Cetie Ames was unaware of those commissions, that she was unaware of the purchase of the SocGen Warrants by the Ames CRUT, that Ohle had a duty to provide her statements for the Ames CRUT and that Ohle had duties and responsibilities to Cetie Ames other than as trustee of the Ames CRUT. Filings in Civil District Court

16

and the Southern District of New York in 2014 (including without limitation documents produced to Ohle in discovery in 2014 and the depositions of Wogan and Tony Ames taken on March 25, 2014 and June 3, 2014, respectively) flatly contradict these fraudulent statements and expose their falsehood. The defendants' false and fraudulent statements directly resulted in the unlawful forfeiture/restitution orders that deprived plaintiffs of valuable property rights and caused other consequential damages to plaintiffs.

39.    Despite actual knowledge of the defendants of the facts and circumstances related to the $4.1 million contribution by Cetie Ames into the Ames CRUT, Cetie Ames and the Ames CRUT (through Wogan), under penalty of perjury, represented to the IRS that Cetie Ames did not understand her wiring instructions which contributed the proceeds to the Ames CRUT, that this transfer was irrevocable and could not be withdrawn later, that she believed that this account was a money market account, that she intended to contribute P&G stock, not cash into the Ames CRUT and that she understood that contributing low basis P&G stock was in "her best interest financially and of no detriment to the charitable beneficiaries." Cetie Ames and the Ames CRUT through Wogan also claimed that Ohle was prohibited from accepting new donations into the Ames CRUT (despite the express terms of the Ames CRUT) because such donations would increase the fair market value of the Ames CRUT, thereby increasing the trustee fee. Filings in Civil District Court and the Southern District of New York in 2014 (including without limitation documents produced to Ohle in discovery in 2014 and the deposition of

17

. . .

Tony Ames taken on June 3, 2014) reveal that these statements were fraudulently made to further the scheme described herein.

40.    In connection with the Request to the IRS for a Private Letter Ruling and as part of the scheme to unlawfully remove millions of dollars from the Ames CRUT, Cetie Ames, Tony Ames and Wogan as trustee of the Ames CRUT filed a Petition for Instructions, together with a memorandum in Support of Petition for Instructions and form of Judgment Granting Instructions to Trustee.  Defendants and others acting on their behalf intentionally failed to include as necessary parties the charitable beneficiaries and failed to serve the office of Louisiana Attorney General who is authorized by law to protect and represent the interests of the charitable beneficiaries in such a proceeding.  The Petition for Instructions included separate sworn Verifications by Wogan as trustee of the Ames CRUT (as petitioner), Tony Ames (as petitioner), and Cetie Ames (as petitioner) declaring the facts and allegations set forth in the Petition for Instructions were true and correct to the best of their knowledge and belief.  The allegations in the Petition for Instructions made under oath by Wogan as trustee of the Ames CRUT, Tony Ames and Cetie Ames were contradicted by Tony Ames' sworn deposition testimony on June 3, 2014, documents produced by Ohle in discovery in 2014, and witness statements to the Department of Justice produced to Ohle in 2014.

41.    The verified Petition for Instructions filed by Cetie Ames (as settlor and income beneficiary), Tony Ames (as income beneficiary), and John Wogan (as trustee of the Ames CRUT) in the Civil District Court for the Parish of Orleans makes the following false and fraudulent allegations, among others:

18

(a)     The former Trustee (Ohle) did not inform the Settlor (Cetie Ames) that the Redemption Notice directed that the Transferred Funds be deposited to the Trust's (Ames CRUT's) account, nor had Settlor (Cetie Ames) told the former Trustee (Ohle) that she wished to donate the Transferred Funds to the Trust (Ames CRUT). Settlor (Cetie Ames) never intended to donate the Transferred Funds to the Trust (Ames CRUT). She (Cetie Ames) intended to temporarily deposit them in a money market account in her own name until she chose long-term investments. Petition for Instructions, par. 5.

(b)     Louisiana law requires as an element of a valid donation that the donor intend to irrevocably divest himself or herself of the property and to make a gift of it to the donee. Settlor (Cetie Ames) had no such donative intent in the case of the Transferred Funds. Settlor (Cetie Ames) did not intend to deposit the Transferred Funds to the Trust's account at all, and certainly not as an irrevocable donation. Petition for Instructions, par. 6.

(c)     Trustee (John Wogan) believes that Settlor (Cetie Ames) lacked any donative intent and did not intend by signing the Redemption Notice to donate the Transferred Funds to the Trust (Ames CRUT). Petition for Instructions, par. 7.

42.     Contrary to the acts, omissions, and concealments of defendants set forth above, Tony Ames stated in his deposition taken on June 3, 2014 that Cetie Ames did, in fact, understand that the proceeds of $4.1 million from her SocGen Warrants liquidation were being contributed to the Ames CRUT. Tony Ames also stated in his June 3, 2014 deposition that there were several meetings and telephone calls discussing the reinvestment of the proceeds and that after those

19

meetings and telephone calls, Cetie Ames decided to transfer such proceeds to the Ames CRUT. Furthermore, filings in Civil District Court and the Southern District of New York in 2014 clearly show that the acts, omissions and concealments of defendants in connection with certain agreements, final accountings and court filings which constituted part of the defendants' scheme to unlawfully remove millions of dollars from the Ames CRUT were fraudulent.

43.     Having made the foregoing affirmative misrepresentations and concealments to Ohle (in connection with various agreements, accountings and orders), to the IRS (in connection with the Request for a Private Letter Ruling), and to the Civil District Court for the Parish of Orleans (in connection with the Petition for Instructions), the defendants continued making these false and fraudulent statements regarding Ohle, the Ames CRUT, and the SocGen Warrants. Uhalt recognized that Cetie Ames could profit from the fraudulent tax shelter activities of Chase, and Cetie Ames' and Uhalt's false statements to the FBI ultimately led to the inclusion of the "Ames allegations" in Ohle's criminal indictment. Defendants continued their false representations and claims in order to improperly obtain additional monies in the form of forfeiture/restitution orders from this Federal court and additional money judgments from a jury in civil litigation. On January 15, 2008, Cetie Ames fraudulently represented to AUSA Stanley Okula and FBI Special Agent Christine Mazzella that Ohle went into her personal bank account at Whitney National Bank and took money and withdrew P&G stock without her knowledge and that she signed documents that she did not know she was signing. On December 1, 2008, Wogan fraudulently represented to AUSA Nanette Davis and FBI Special

Agents Christine Mazzella and Shawn Chandler that Cetie Ames never understood that the monies she contributed to the Ames CRUT would be invested in the trust, but rather she thought she would be able to get back the money she contributed. On December 1, 2008, Uhalt fraudulently represented to AUSA Nanette Davis and FBI Special Agents Christine Mazzella and Shawn Chandler:

(a)    Uhalt stated that Tony Ames was living off of Uhalt's mother.

(b)    Uhalt stated that Ohle and Tony Ames did not want Uhalt around or involved with Cetie Ames' money.

(c)    Uhalt stated that Ohle wanted to comingle all of Cetie Ames' money and combine it into one joint account with Tony Ames.

(d)    Uhalt stated that his stepfather Tony Ames wanted the funds comingled because it served his stepfather better.

(e)    Uhalt stated that had his stepfather Tony Ames knew what he knows today, his stepfather would not have signed the IRS Private Letter Ruling Request relative to their tax situation.

(f)    Uhalt stated that it was 100% Ohle's decision to enter the Carpe Diem investment on his mother's behalf.

44.    Cetie Ames and Uhalt claimed, inter alia, that SocGen Warrant sales commissions were paid to Ohle, that Ohle used these sales commissions to provide funding to the Browns as third party purchasers in the "HOMER" transactions, that the Browns required this funding to participate as third party purchasers in the "HOMER" transactions, that Cetie Ames was entitled to a portion of Bank One's "HOMER" fees, that Cetie Ames was entitled to a portion of the monies earned by the

Browns as third party purchasers, that Cetie Ames was entitled to a portion of the gains on the "HOMER" options realized by the Browns, that Ohle was not authorized to make short-term interest bearing investments without Cetie Ames' approval, that certain transfers which were conclusively found to be loans under Louisiana trust law were "embezzled" funds and that Cetie Ames was sold illegal tax transactions by Ohle.  In furtherance of the scheme, Wogan falsely testified under oath at Ohle's criminal trial that Ohle did not comply with Wogan's request for documents relating to the Ames CRUT's adjustable rate deposit investments:

| | |
|---|---|
| Davis: | You mentioned that there was some discussion about an adjustable rate deposit investment. I think you stated in response to a question on cross. Do you recall that? |
| Wogan: | Yes. |
| Davis: | Did you receive any documentation from Mr. Ohle about the adjustable rate deposits? |
| Wogan: | No, we didn't. |
| Davis: | Did you ask for it? |
| Wogan: | We asked for everything that had to do with the trust. |

[Ohle Criminal Trial Transcript, p. 880; Note:  Davis refers to AUSA Nanette Davis]

45.    Also, in furtherance of the scheme, Uhalt testified at Ohle's criminal trial in the Southern District of New York in May 2011.  Uhalt testified that he had questions about the investments in the SocGen Warrants and that he called Ohle in the latter part of 2002:

| | |
|---|---|
| Davis: | Did you see statements, Mr. Uhalt, from the Carpe Diem investment? |
| Uhalt: | Not at that time. |
| Davis: | Did your [sic] ask for a meeting with Mr. Ohle? |
| Uhalt: | Yes, I did. |
| Davis: | Did you have that meeting? |
| Uhalt: | Yes, we did. |
| Davis: | Where was that meeting? |
| Uhalt: | At my office in New Orleans. |
| Davis: | When was that meeting? |

22

| | |
|---|---|
| Uhalt: | The latter part of 2002. |
| Davis: | Tell us what happened at that meeting. |
| Uhalt: | I called John in and I said I have the power of attorney of my mother, I want to see every single statement, every transaction, everything to do with that account from day one. |

[Ohle Criminal Trial Transcript, p. 728, l. 9-23]

46.     Uhalt specifically testified that he had "power of attorney of my mother." Without a POA from his mother, Uhalt would have no right to his mother's financial information.

47.     Uhalt continued his testimony based on his claimed POA from his mother by stating that he was going to hire a lawyer because he thought that there was a problem with Ohle's actions as trustee of the Ames CRUT:

| | |
|---|---|
| Davis: | Did you advise Mr. Ohle about what your actions would be if you did not get the information? |
| Uhalt: | Yes, I did tell him I was going to hire a lawyer. |
| Davis: | Do you know whether a lawyer was hired? |
| Uhalt: | I was in the process of either getting the documents, I was going to do it regardless because I think we had a problem. |
| Davis: | Was a lawyer hired? |
| Uhalt: | Yes. |
| Davis: | Who was that lawyer? |
| Uhalt: | John Wogan. |
| Davis: | Mr. Wogan is located in what city? |
| Uhalt: | New Orleans. |

[Ohle Criminal Trial Transcript, p. 730, l. 9-20]

48.     Due to the significance of Uhalt's claim that he was authorized to act on behalf of Cetie Ames, Ohle's criminal attorney Stuart Abrams immediately questioned Uhalt on cross-examination about his claims:

| | |
|---|---|
| Abrams: | I am Stuart Abrams; I represent John Ohle.  You didn't have power of attorney over your mother's accounts, did you? |
| Uhalt: | Yes, I did. |
| Abrams: | In 2001 and 2002? |
| Uhalt: | Thereabouts, we got one in that timeframe, yes. |

23

| | |
|---|---|
| Abrams: | You did? |
| Uhalt: | Yes. |
| Abrams: | Do you have it with you? |
| Uhalt: | No, I don't. |
| Abrams: | Did you ever give it to the government? |
| Uhalt: | There is a lot of files; I am sure it's in there. |
| Abrams: | You are just making that up, Mr. Uhalt? |
| Uhalt: | You would like to think that but no. |
| Abrams: | Mr. Uhalt, in fact, I think you said today that you control everything, right? |
| Uhalt: | At this point, I manage the assets. |
| Abrams: | At same [sic] point in time you are aware that there was a final accounting that was approved by the court in Louisiana regarding Mr. Ohle as trustee? |
| Uhalt: | You mean the settlement? |
| Abrams: | Yes. |
| Uhalt: | Yes, I am aware of that. |
| Abrams: | It was filed with the court in Louisiana and approved, right? |
| Uhalt: | We had no choice but to sign that. |
| Abrams: | The court in Louisiana approved of the settlement, correct, yes or no? |
| Uhalt: | yes, that is true. |
| Abrams: | Mr. Wogan became trustee of your mother's trust, correct? |
| Uhalt: | At that point, yes. |
| Abrams: | Mr. Wogan today is no longer trustee? |
| Uhalt: | No, he is not. |
| Abrams: | Are you? |
| Uhalt: | Yes, I am. |
| Abrams: | So now you are the trustee of your mother's trust, correct? |
| Uhalt: | That's correct. |

[Ohle Criminal Trial Transcript, p. 731, l. 2 - p. 732, l. 12]

49.     The trial judge, also recognizing the importance of Uhalt's claim that he was acting under a POA on behalf of Cetie Ames, immediately called a sidebar conference upon the conclusion of Uhalt's testimony:

| | |
|---|---|
| Court: | I assume the government has been instructing their witnesses just to answer the questions put.  If we have another witness who does what the last witness did, the court will take very affirmative action that the government will not be very happy about. |
| Davis: | Your Honor, I can assure you we had numerous conversations with Mr. Uhalt about his decorum on the stand.  I apologize. |

24

| Court: | He claimed by the way that he could determine when someone's face turned white. I assure you that if he had continued much longer in the way he was continuing, it would have been his face that would have been turning red. Now, did the government ever receive a power of attorney. |
| Davis: | I don't recall seeing one, your Honor. |
| Court: | I assume from questions raised that defense counsel may be making an argument on summation that he lied about that, and given the present state of the record, I think that would be permissible argument. |

[Ohle Criminal Trial Transcript, p. 739, l. 1-18]

50.    Of course, the jury in Ohle's criminal proceedings did not hear this sidebar conference. The jury only heard Uhalt's perjured testimony that he had a POA from his mother Cetie Ames and that based on that POA, he ultimately gained control of his mother's assets, uncovered Ohle's misdeeds, and replaced Ohle as trustee. and replaced Ohle as trustee. [At Ohle's criminal trial, Uhalt specifically testified that he demanded financial information from Ohle in connection with Ohle's conduct as trustee of the Ames CRUT. Uhalt's investigation was based upon his assertion that he held a POA from his mother Cetie Ames and had the right to the confidential financial information regarding his mother's financial affairs and the Ames CRUT. Without this POA, Uhalt would not have had access to this financial information, and his testimony at Ohle's trial would have been meaningless. Uhalt also falsely testified that he was appointed trustee of the Ames CRUT creating another false inference that he had direct access and knowledge of Ohle's actions as prior trustee of the Ames CRUT, as shown by Uhalt's recent deposition in civil litigation:

Q.    Question, "Mr. Wogan today is no longer trustee? Answer, "No, he is not." Question, "Are you?" Answer, "Yes, I am."

| A. | Well, it's clearly mistaken.  I mean, the trustee is Mr. Medo, not me. And then I just probably was, you know, either nervous on the stand or just answered the question incorrectly. |
|---|---|
| Q. | But that answer was inaccurate? |
| A. | I would say that answer probably is inaccurate. |
| Q. | It was false?  Is it true? |
| A. | It's not true. |
| Q. | It's not true.  So, it was false? |
| A. | It's not true.  Okay, it's a false answer, but it wasn't intentionally. |
| Q. | All right.  Let's go to the next one. |
| A. | Okay. |
| Q. | So you answer it, "Yes I am."  Then you're asked the same question again. |
| A. | I'm sorry, where -- |
| Q. | 732, Line 11 through 12, "So now you are the trustee of your mother's trust, correct?"  Answer, "That's correct."  Do you see that? |
| A. | Yeah, I mean, I hear you. |
| Q. | I said do you see it? |
| A. | Yes.  Yes, I see it. |
| Q. | All right.  And again, that's false? |
| A. | That is false. |

[Deposition of Uhalt taken in Ames v. Chase et al., Civil Action 11-440, CDC-Orleans Parish, on May 29, 2014, pp. 205-207]

51.     Uhalt also admitted in his deposition taken on May 29, 2014 that he did not have a POA from his mother until 2009, and such POA was for the limited purpose of prosecuting the civil action against Chase and others:

| Q. | --did you have a written power of attorney with respect to your mother's affairs? |
|---|---|
| A. | You know, looking back, no, probably not, but we did have -- there were times when my mom would ask me for things.  I would go to Wogan and I  know -- and, look, I can't remember everything, so if I have to -- if you have to press me on it, I'd have to say I don't remember.  But there were times that I had a power of attorney over my grandmother, so there were, you know, it was kind of involved but not involved.  There were certain periods of time that I may have been more involved than others.  During this particular -- |
| Q. | Let me -- |
| A. | Just let me finish.  During this particular time -- |
| Q. | I apologize. |
| A. | That's okay.  I just don't want to talk over each other.  So, during this particular time I don't remember exactly what, you know, time. |

26

Q.    I want to be clear, though.  During that period of time when Mr. Wogan had certain responsibilities with respect to your mother's affairs, you didn't have a written power of attorney, correct?

A.    Let's just assume that I did not in your case, but I don't remember exactly if I did or did not.  And the reason being, because there were times that I had had power of attorney dating back to my grandmother where, you know, I was involved in trying to clean up her estate before she passed away, then I may not have had one for a period of time with my mother, then I may have been more involved with John Wogan dealing with the stuff related to John Ohle.  So, did I have something that may have been in writing?  I mean, what -- I'm not a hundred percent sure.  That's my answer.  My mom may have picked up the phone and said, "Tell Huey the information.  Give Huey the information."

Q.    I understand.

A.    So, a written -- is that a written document?  No.

Q.    All right.  And, again, my question is whether a written document existed during the time period that Mr. Wogan was advising your mother, a written document that gave you power of attorney, and the answer to that question is no; correct?

A.    I would assume if it's not in that file, then the answer is no.

* * * * *

Q.    Well, first off, do you recall testifying to this under oath during the trial of Mr. Ohle?

A.    Yeah, I have a recollection of this, yeah.

Q.    All right.  And just generally speaking, what are you testifying to here, what was the subject matter of your testimony here?

A.    Just -- I'm sorry.  I was just -- just wanted to meet with Ohle because my mom had expressed some concern, and she had asked me, and I was setting up a meeting with John to discuss it.

Q.    All right.  And do you recall having given the testimony regarding the meeting with Mr. Ohle during the criminal trial of John Ohle?

A.    Yeah, to some -- to some extent, yeah.

Q.    All right.  And if you focus on 728, Lines 20 through 23, question, "Tell us what happened at the meeting."  Answer, "I called John in and said I have power of attorney of my mother, I want to see every single statement, every transaction, everything to do with that account from day one."

A.    Yes.

Q.    Do you see that?

A.    Yeah.

Q.    Is that what you told Mr. Ohle, that you had power of attorney?

A.    Apparently I did, I did say that, yeah.

Q.    All right.  And that wasn't true, was it?

A.    Once again --

Q.    Yes or no.

27

A.    It's very vague again.

Q.    Is it very vague?

A.    I think it's pretty vague.

Q.    Did you tell Mr. Ohle that you had power of attorney, yes or no?

A.    I think I did say that.

Q.    All right. Was that true?

A.    You know, my mom had asked me to get the information, very clearly. Go talk to Mr. Ohle, get the information. So, you know -- you know, I mean, it was very clear what her directive was to me, okay. And, so, you know -- you know, you can say whatever you want but, I mean, we had -- I don't remember exactly what had taken place. I had had powers of attorney from time to time over my grandmother and for various family members. Sometimes they've come in the form of like these little one-off things.

Q.    So, now are you changing your testimony from earlier today when you testified that you had no recollection of having a power of attorney?

A.    I really don't have a recollection -- of having a hard power of attorney. I don't remember if I had one or didn't have one.

\* \* \* \* \*

Q.    The document marked as Uhalt Exhibit 17 [an August 5, 2003 letter from Cetie Ames to Wogan], this document authorizes Mr. Wogan to release certain financial information --

A.    Yeah.

Q.    -- to you; correct?

A.    Yeah.

Q.    Certain financial information of your mother; correct?

A.    Yes.

Q.    It doesn't authorize you to engage in any financial transactions on her behalf?

A.    No, it does not.

Q.    All right. If you had power of attorney at this point in time, would there be a need for your mother to authorize Mr. Wogan to release financial information to you?

A.    No, I guess not.

Q.    All right.

A.    Okay.

Q.    All right. So -- all right. Again -- and, again, we're back to this time period, 2003, you don't have power of attorney with respect to your mother; right?

A.    Maybe I -- if I --you know what? I don't remember.

[Deposition of Uhalt taken in Ames v. Chase et al., pp. 53-55; 201-204; and 193-194.]

52.    Uhalt only obtained a general POA from his mother on March 11, 2014. As a result, all of the acts, omissions and concealments set forth above were

based on Uhalt's false and fraudulent representations that he had a POA from his mother and that he was trustee of the Ames CRUT and were central to Uhalt's scheme to unlawfully gain control of his mother's fortune through false and fraudulent statements, representations, and testimony concerning Ohle's role and actions in his mother's financial affairs.

53.    The fraudulent acts, omissions and concealments of the defendants set forth herein continue to be promoted and published to this day.  In January 2011, the defendants caused a fraudulent Victim Impact Statement to be filed in the U.S. District Court for the Southern District of New York and continue to fraudulently claim victim status through the present day.  Furthermore, the defendants, despite having made embezzlement allegations against Ohle, have never reported any self-dealing to the IRS and have submitted tax returns through the present day which effectuate the fraud scheme described herein.  Such fraudulent acts, omissions and concealments were designed to circumvent agreements, final accountings and Orders of the Civil District Court for the Parish of Orleans, State of Louisiana, regarding the administration and accounting of the Ames CRUT to unlawfully deprive plaintiffs of their valuable property rights, all of which have caused extensive actual and consequential damages to plaintiffs, such damages to be trebled according to law, stemming from the restraint, forfeiture and/or loss of certain of plaintiffs' assets, including, but not limited to, a condominium located at 837 Royal Street, New Orleans, Louisiana, the related lost income from the condominium arising from the restraint/forfeiture of the property, $498,311 of equity in a personal residence located at 1940 Chestnut Avenue, Wilmette, Illinois,

where Patricia Dalton Ohle and her children reside, plus an additional 32.77% of the equity in that residence, and sports memorabilia and other valuable assets, as well as other consequential losses such as valuation losses, lost profits, expenses including legal fees and storage fees, and other losses related to the restraint and/or forfeiture of these assets. Additionally, Patricia Dalton Ohle and her three children have suffered mental pain and anguish, humiliation, embarrassment, loss of affection, loss of enjoyment of life, reputational damages, and distress, all in an amount to be shown at trial. Moreover, defendants' morally reprehensible conduct was accomplished by malice and with reckless or willful disregard for plaintiffs' rights, and plaintiffs are entitled to recover punitive damages to punish the defendants and to deter future wrongdoing, as well as pre- and post-judgment interest, attorney's fees and costs.

### Count One: Violation of 18 U.S.C. 1962(c)

54.    Plaintiffs reallege and incorporate by reference paragraphs 1-53 above.

55.    Title 18 U.S.C. 1962(c) prohibits persons employed by or associated with any enterprise from conducting or participating in the enterprise's affairs through a pattern of racketeering activity. The defendants herein constituted an association-in-fact enterprise (the "Enterprise") which was engaged in, and the activities of which affected, interstate commerce. The defendants participated in the operation and management of the Enterprise and its affairs through a pattern of racketeering as alleged herein. It was a purpose of the racketeering activity for the defendants to use the Enterprise to unlawfully remove millions of dollars from the

30

Ames CRUT, unlawfully remove Ohle as trustee of the Ames CRUT and to insert Wogan as successor trustee, and wrongfully recover monies through unlawful forfeiture/restitution orders.

56.    The defendants, being persons associated with the Enterprise described above, did knowingly, intentionally, and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. The pattern of racketeering activity from 2002 through the present consisted of the following predicate acts of mail fraud and wire fraud in violation of 18 U.S.C. 1341 and 1343 which are related and amount to and/or pose a threat to continued criminal activity:

(a)    fraudulent misrepresentations in connection with the scheme to gain control described in Paragraphs 25-31;

(b)    fraudulent misrepresentations to the IRS, the courts, and the DOJ described in Paragraphs 32-44; and

(c)    fraudulent misrepresentations in connection with the January 2011 filing of the Victim Impact Statement in the U.S. District Court for the Southern District of New York, Wogan's appearance before the Louisiana Board of CPAs in August 2013, and the filing of IRS tax returns for the Ames CRUT and fraudulently claimed victim status through the present day described in Paragraph 48.

57.    The above racketeering activity in the affairs of the Enterprise was in violation of 18 U.S.C. 1962(c). Plaintiffs have been injured in their business and property by reason of the violation of 18 U.S.C. 1962(c). Plaintiffs are entitled to

31

recover their actual and consequential damages, to be trebled as provided by law, as well as pre- and post-judgment interest, attorney's fees and costs.

## Count Two: Violation of 18 U.S.C. 1962(d) by Conspiracy to Violate 18 U.S.C. 1962(c)

58.     Plaintiffs reallege and incorporate by reference paragraphs 1-52 above.

59.     Each defendant is a "person" within the meaning of 18 U.S.C. 1961(3). Pursuant to an agreement and understanding among the defendants, the defendants all conspired to violate the provisions of 18 U.S.C. 1962(c) and did so in violation of the provisions of 18 U.S.C. 1962(d).   As a direct and proximate result of this conspiracy, and the acts and omissions taken in furtherance thereof and constituting "racketeering activity" within the meaning of 18 U.S.C. 1961, plaintiffs were injured in their business and property as set forth in 18 U.S.C. 1964 and are entitled to recover their actual and consequential damages, to be trebled as provided by law, as well as pre- and post-judgment interest, attorneys fees and costs.

## Count Three:  Fraud

60.     Plaintiffs reallege and incorporate by reference paragraphs 1-48 above.

61.     The acts, omissions, misrepresentations and concealments of the defendants described above which were relied upon by the plaintiffs constitute fraud.  The fraudulent acts, omissions, misrepresentations and concealments of the defendants caused and/or contributed to plaintiffs losing valuable property rights and suffering extensive monetary damages stemming from the restraint, forfeiture and/or loss of plaintiffs' assets as well as other consequential losses such as

valuation losses, lost profits, expenses including legal fees and storage fees, and other losses related to the restraint and/or forfeiture of these assets. Additionally, Patricia Dalton Ohle and her three children have suffered mental pain and anguish, humiliation, embarrassment, loss of affection, loss of enjoyment of life, reputational damages, and distress.

62.    The defendants had a duty to truthfully disclose that the representations to Ohle, the IRS, the government and the courts, which were relied upon by the plaintiffs, were false and fraudulent. Instead, the defendants concealed the truth by the acts and omissions described above as part of their schemes to unlawfully obtain monies from forfeiture orders, restitutions orders and judgments, to unlawfully remove millions of dollars from the Ames CRUT, to unlawfully remove Ohle as trustee of the Ames CRUT and insert Wogan as successor trustee, and to permit Uhalt to unlawfully gain control of Cetie Ames' fortune.

63.    Plaintiffs suffered consequent and proximate injury as a direct result of defendants' false representations, omissions and/or concealments that caused plaintiffs damage financially as well as to their personal reputations. In addition to recovering actual and consequential damages in an amount to be proven at trial, plaintiffs are entitled to recover punitive damages from defendants because their conduct demonstrated a high degree of moral culpability and was so flagrant as to evidence a conscious disregard for the rights of others, as well as pre- and post-judgment interest, attorneys fees and costs.

### Count Four: Conspiracy to Defraud

33

64.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 48 above.

65.    From 2002, the defendants and others acting on their behalf, as described above, devised and intended to devise an unlawful scheme and artifice to defraud plaintiffs, Ohle, and others.

66.    The purpose of the fraud scheme was to unlawfully obtain monies from plaintiffs by making the above described fraudulent misrepresentations and linking those representations with Chase's illegal tax shelter activities, to remove millions of dollars from the Ames CRUT, to defraud and disadvantage plaintiffs, Ohle and others (including without limitation by fraudulently inducing Ohle to resign as trustee of the Ames CRUT in order to, among other things, perpetrate the Request for Private Letter Ruling/Petition for Instructions/Forfeiture Order fraud), to fraudulently claim victim status in civil and criminal proceedings, and to unlawfully gain control of Cetie Ames' fortune at the expense of plaintiffs, Ohle, numerous charitable organizations, and others.   The conspiracy was effected in part through false and perjured testimony and sworn declarations to the courts, the Department of Justice, and to the IRS.  The defendants' schemes continue to this day and are completely intertwined with the acts and omissions described herein in furtherance of the conspiracy.

67.    The defendants and others engaged in a conspiracy to effectuate the unlawful schemes outlined above for their own and each other's illicit benefit.

68.    Plaintiffs were injured as a  result of the conspiracy to defraud.  The defendants are not only liable to plaintiffs for the full amount of plaintiffs' actual and

consequential damages but also for punitive damages based on defendants' malicious conduct and willful disregard of plaintiffs' rights, as well as for pre- and post-judgment interest, attorneys fees and costs.

### Count Five: Unjust Enrichment

69.    Plaintiffs re-allege and incorporate by reference paragraphs 1-48 above.

70.    Plaintiffs conferred a benefit upon defendants by entering into a Stipulation with the government regarding the restraint, forfeiture and/or loss of certain of plaintiffs' valuable assets.  Defendants had knowledge of the benefits conferred upon defendants, as well as the fraud and false pretenses that led to the Stipulation and the transfer of money and/or assets from the plaintiffs.  Defendants accepted and obtained benefits under circumstances that make it inequitable for them to retain the benefits to which they have no lawful right or entitlement. Defendants have been unjustly enriched, and plaintiffs are entitled to recover actual and consequential damages from defendants, as well as pre- and post-judgment interest, attorney's fees and costs.

71.    Plaintiffs demand a trial by jury on the claims set forth herein.

WHEREFORE, plaintiffs Patricia Dalton Ohle (individually and on behalf of her children), Museum of Sports History LLC, Dalton-Ohle Investment Property Trust, JSJD Trust and Festivus for the Rest of Us, Inc. pray that this complaint be duly filed and served on defendants Ecetra N. Ames, Hugh A. Uhalt, John D. Wogan, Anthony M. Ames and the Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Unitrust, and that after due proceedings have been had, including a trial by jury, that

the court enter judgment in favor of plaintiffs and against defendants Ecetra N. Ames, Hugh A. Uhalt, John D. Wogan, Anthony M. Ames and the Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Unitrust, jointly, severally, and solidarily in an amount of actual damages proven at trial, with such damages to be trebled according to law; an amount of punitive damages necessary to punish the defendants and to deter the defendants from such conduct in the future; pre- and post-judgment interest until the judgment is paid; attorneys fees and all costs of this action; and such other and further relief as may be just and equitable.

Respectfully submitted,

Wesley D. Ehrhardt, *Pro Hac Vice Pending*
WDE@PattersonEhrhardt.com

PATTERSON EHRHARDT, PLLC
Post Office Box 399
213 N. Main Street
Como, Mississippi 38619
(T): (662) 526-1992

*Attorneys for Plaintiffs*

36